## W. B. PEPPER v. W. C. SMITH, et al.

1. TAXING DISTRICTS. *Second class. Organization.* Under the act of 1881, ch. 127, (new Code, sec. 1,677 *et seq.*), the population and territory of a town, whose charter has been repealed, may be organized into a taxing district, by the appointment of commissioners by the county court, upon the petition of a majority of the voters of the district, at the time the petition is filed, whether they were voters at the time of the repeal or not, the majority being ascertained by the vote of the last municipal election, as provided by the act.

2. SAME. *Same. Motive of petitioners.* The motives of one of the petitioners for the organization of the taxing district could not affect the rights of the other petitioners, if a majority of the voters, nor can the motives of any of the petitioners be inquired into under a bill filed to contest the legality of the organization, nor his character be impeached, and the chancellor properly excluded all such evidence as irrelevant.

3. SAME. *Same. Act of 1885 construed.* The act of 1885, ch. 82, amending the act of 1881, does not disclose any different legislative intent as to the petitioning voters, even if the subsequent legislation could affect rights already acquired under the previous organization.

### FROM GILES.

Appeal from the Chancery Court at Pulaski. W. S. FLEMING, Ch.

JNO. T. ALLEN for complainant.

N. SMITHSON for defendants.

COOPER, J., delivered the opinion of the court.

Bill filed to contest the legal organization of the taxing district of Lynnville. The chancellor, upon final hearing, dismissed the bill, and the complainants appealed.

Lynnville being an incorporated town, its charter was repealed by the Legislature by an act approved on March 29, 1883. The Legislature had, by the previous act of 1881, ch., 127, (new Code, sec. 1,677 *et seq.*), provided that the several towns, cities or communities in the State, whose population does not exceed thirty thousand, and whose charters of incorporation had been repealed, or might thereafter be repealed, "are hereby created taxing districts, to be styled taxing districts of the second class, in order to provide the means of local government for the peace, safety and general welfare of the people thereof." It is then provided that the government of each of said taxing districts should be vested in a board of three commissioners, to be appointed by the chairman of the county court, in open court, who shall hold office for two years, and until their successors are elected by the qualified voters in the district, and qualified. Then follows this provision: "On the petition of a majority of the voters within the limits of any such town or city, at the time of the repeal or surrender of its charter to the county court, said court shall appoint the three commissioners for the government of said town or city. To ascertain whether a ma-

jority of the voters have petitioned, the number of votes cast at the last municipal election preceding the abrogation of the charter, shall be taken as the number of legal voters within the territory." The act undertakes to levy the annual tax for municipal purposes, and contains a number of other provisions not necessary to be noticed.

On March 19, 1884, a petition was presented to the county court for the appointment of commissioners to govern the taxing district of Lynnville, and on the next day commissioners were appointed by the court, who qualified by taking the oath and giving the bond required by the statute, and entered upon the discharge of their duties. The present bill was filed on April 14, 1884, by eighteen persons, as owners of property and voters within the limits of the taxing district, against the commissioners, to have the organization of the district declared void, and to perpetually enjoin the defendants from continuing to act officially.

The first and main point relied upon by the complainants to sustain their bill, is that the proper number of voters did not join in the petition to the county court. It is agreed by the parties that the number of votes cast at the last municipal election preceding the repeal of the charter was forty-five. It is further agreed that at least thirty of the petitioners to the county court were qualified voters within the limits of the district at the time of the filing of the petition, only nineteen of the thirty being also voters at the time of the repeal of the charter. And the

contention of the complainants is that the statute requires a majority of the voters at the time of the repeal. This depends upon the construction of the language of the taxing district act. That language is: "On the petition (to the county court) of a majority of the voters within the limits of any such town or city at the time of the repeal or surrender of the *charter*." The argument is that the words "at the time of the repeal" qualify the word "voters," and limit the right of petition to those persons who were then voters. But the rule of construction of English composition is to apply qualifying words to the immediate, and not the remote antecedent, unless otherwise imperatively required by the context. According to this rule, the words in question merely define the limits of the town within which the petitioning voter must be a voter. If, moreover, you apply the qualifying words to the voters, then you have nothing to define the limits of the town or city. And it may well be asked what limits? For there is, then, no town or city. The plain meaning, we think, is that the petitioners must be voters at the time of the petition within the limits of the corporation at the repeal of the charter. And this conclusion is rendered more certain by the fact that the act is a continuing act, authorizing an application to be made at any time after the repeal, whenever the majority of the voters should see proper to re-organize a new corporation, notwithstanding any changes which might in the meantime occur among the voters.

It is next insisted that the petition does not show

Pepper *v.* Smith.

that the petitioners were a majority of the legal voters in the district. If this objection means anything more than the point we have already considered, as it probably does not, it is not well taken in point of fact. For the petition expressly states that the number of votes cast at the election next preceding the repeal of the charter was forty-five, that twenty-three would be a majority thereof, and that each and all of the petitioners, being more than thirty in number, is and are legal voters within the boundary, which is given, of the late corporation.

The only other error relied on is in the action of the chancellor excluding certain evidence as irrelevant, and deciding the case accordingly. The bill, instead of confining itself to the real issue touching the validity of the organization of the taxing district, undertook to attack the motives of the petitioner who seems to have been most active in organizing the corporation, and to impugn his character. The gravamen of this part of the bill was that the main object of the particular petitioner was to enable him to open a drinking saloon within four miles of an incorporated institution of learning. But the private motives of one petitioner could not affect the legal rights of the other twenty-nine. And besides, nothing is better settled than that it is no defense to a legal right, asserted in the mode prescribed by law, that the party is actuated by improper motives, for the obvious reason that the effect would be, were the law otherwise, to turn nearly every suit into a wrangle over motives, and the courts into arenas of mutual recrimina-

tion and invective: *Payne* v. *Railroad Co.*, 13 Lea, 525; *Macey* v. *Childress*, 2 Tenn. Ch., 442, and cases there cited. See also *Kiff* v. *Youmans*, 86 N. Y., 324; *Davis* v. *Flagg*, 35 N. J. Eq., 491.

The Legislature has the power to incorporate municipal corporations without previously consulting the corporators, and may, of course, prescribe the mode in which the organization of such a corporation shall be effected under the general law. We have held in two cases at Knoxville that municipal corporations might be legally organized in the mode prescribed by the act under consideration if rightfully pursued.

The Legislature, on April 4, 1885, amended the act of 1881, ch., 127, among other things, by requiring the commissioners, after their appointment by the county court, to hold a popular election "to ascertain whether a majority of the legal voters within the boundaries of such district" desire the organization of the corporation. The act then provides that the election shall be held within the boundaries of the district in the manner, and subject to the laws of elections for county officers, and prescribes the form in which the voters shall express their wishes. And adds, in the same sentence, "that the legal voters of the said election shall be the same that were legal voters at the time of the abolition of the former charter." It is suggested that this clause is a legislative recognition of the construction of the former act as contended for by the complainants, namely, that the voters at the time of the repeal of the former charter should alone have a voice in the reorganization of the corporation.

If the new act had clearly disclosed a legislative intent as contended for, it would be entitled to great weight. For, although a legislative construction of a former act is not binding on the courts, and although corporate rights acquired in 1884 could scarcely be affected by subsequent legislation not intended to affect those rights, yet it would be strongly persuasive as to the meaning of the words used. But it will be noticed that the act of 1885 expressly directs the election to be held "to ascertain whether a majority of the legal voters within the boundaries of such district" desire the organization, plainly meaning the legal voters at the date of the election. And the subsequent clause merely provides that the legal voters shall be the same as the legal voters at the repeal of the charter, that is the voters within the district shall have the same qualifications as the old voters were required to have in order to entitle them to vote. It does not mean that they shall be the same individuals, but they shall possess the same qualifications.

There is no error in the decree of the chancellor, and it will be affirmed with costs. If any decree has been heretofore entered to the contrary, it will be set aside and annulled.


TURNEY, J., delivered the following dissenting opinion:

The bill in this case was filed by a number of citizens of Giles county, residents of Lynnville Station, against the defendants, who claim to be commis-

sioners of Lynnville taxing district, enjoining them from the exercise of the powers, duties and functions of commissioners, charging that the attempted organization of a taxing district was in violation of, and a fraud upon, the law, and for the purpose of enabling the movers to sell spirituous and intoxicating liquors within four miles of a chartered institution of learning. The proof clearly shows that the object of the principle actors, was to enable themselves to engage in tippling, which they at once began to do.

Lynnville academy is a chartered institution since July 28, 1881, and within one mile of Lynnville Station.

In 1883, the General Assembly repealed the charter of Lynnville Station. On March 19, 1884, one year less ten days after the repeal of said charter, a petition was presented to the chairman of the county court, to have him appoint three commissioners to organize a taxing district for the town of Lynnville. The petition had the signatures of thirty-three names. At the last municipal election had before the repeal of the charter, forty-five votes were cast, and sixty-eight persons entitled to vote. It is agreed, that of the petitioners only nineteen were living within the corporate limits at the last municipal election, and that fourteen did not, and were not entitled to vote in said election; that thirty were living within the limits of the town at the time the petition was filed, and the others outside.

It is argued that Gordon & Angus set it on foot and employed counsel to file the petition, and that their object was to sell whisky in the town.

The act of 1881, chapter 127, New Code, 1677, 1678, 1679, provides: " The several towns, cities or communities in this State, whose population does not exceed thirty thousand, and whose charters of incorporation have been repealed, or shall hereafter be repealed, abolished, or in any manner become extinct, are hereby created taxing districts of the second-class," etc.

" The government of said several taxing districts of the second-class, shall be vested .in a board of three commissioners for each district, to be appointed by the chairman of the county court, in open court," etc.

" On the petition of a majority of the voters within the limits of any such town or city at the time of the repeal or surrender of its charter to the county court, said court shall appoint the three commissioners for the government of said town or city," etc. The number of votes cast at the last municipal election before repeal, to be taken as the number of legal voters in the territory.

Was the proceeding in the county court pursuant to this law? Were the petitioners constituted of voters defined by it? Did such a majortity as the act contemplates petition? It has been seen that forty-five votes were the number cast at the last municipal election, but that of these only nineteen signed the petition.

Was it intended by the Legislature that the persons who abolished the charter should organize a taxing district, or did it intend that new comers, making a majority of the number of votes cast, should control?

There is no difficulty in reaching the meaning of the Legislature if we give to its language its plain, literal, unambiguous and common significance. It is *" a majority of the voters within the limits of the town at the time of the repeal or surrender of its charter."* Can this be tortured to mean that twenty-three men, who lived in another State at the time of the repeal, may move within the limits, remain long enough to be voters under the law, and then petition and have the taxing district organized, taking no account whatever of the forty-five voters who were within the limits at the time of repeal, and voted at the last election, or of the twenty-three who did not vote?

Does it mean twenty-three boys, living in the same civil district of the county, and becoming of age after the repeal, may move into the town and organize a taxing district against the will of sixty-eight older voters and citizens? Such legislation would contravene public policy, and tend to subvert the principles of our form of government.

Both questions must be answered affirmatively, unless we give to the language of the act its plain and common sense meaning; for, if we may say that fourteen new comers may add themselves to nineteen of the original corporators and make the organization, we may, for the like reason, say that if one of the original voters desires the organization, he may induce twenty-two strangers to come within the limits and with him control the sixty-seven who do not desire a municipal government.

If strangers may work such changes in one year

after the *abrogation* of a charter, why may they not five or twenty years after ?

The institution of learning is claimed to be an excellent one, such as is usually likely to induce parents to move to it that their children may have its benefits. Suppose, in this case, a hundred fathers had moved with their children to the town of Lynnville Station and procured homes, would it then be a correct holding to say that the Legislature intended by its enactment to put it in the power of nineteen citizens, added to fourteen strangers, to change the plan of government without the consent of the original forty-nine voters and the one hundred new ones? Certainly there is no warrant in our constitution for such adjudication or legislation.

Did the Legislature mean to pull down rather than build up? We must so hold, if we construe the act to mean that twenty-three men, come whence they may, shall rule in this case.

It is apparent that a majority of the sixty-eight voters within the limits at the time of the repeal, and of the forty-five who voted at the last election, did not want the organization. The record shows that energetic efforts were made to procure names to the petition, and we are compelled to infer that those whose names do not appear to the petition, had the opportunity and refused to sign.

Taking the law as an entirety, it is evident the Legislature meant to have the dissolution of one form of government and the substitution of another as nearly one act as it was possible. It makes the

dissolved corporation a taxing district, and at the same time provides for its organization. It contemplates reasonably prompt actions on the part of the then voters of the district. Failing of this, they are remitted to the law for the formation of municipal corporations (M. & V. Code, sec. 1575 *et seq.*), or will remain an unincorporated community. I doubt the constitutionality of that part of the taxing district law already cited, fixing the mode of ascertaining the majority. This case presents the exact illustration of my objection. Here was a municipal corporation, with a voting population of sixty-eight; at its last election forty-five voted and twenty-three failed to vote. Under this statute the forty-five who voted are at the mercy of the twenty-three. The forty-five may desire to have no municipal form of government that their schools may be protected by the four mile law, as it is called. The twenty-three may prefer the liquor traffic to the schools. They are the majority under the act; still they are but one more in number than one-third of the voting population, with statutory authority to organize a corporation against the will of the two-thirds. There is no *republicanism* in this. The forty-five who vote are disfranchised because the twenty-three did not, and it might be that the twenty-three failed to vote on purpose to get such advantage. To make the case the more applicable, if this proceeding is *held* good, we then have thirty voters disfranchising fifty-two, and dictating their form of government, imposing taxes, etc. There were eighty-two voters within the territory when the petition was filed.

Pepper *v.* Smith.

The Legislature has no authority or power to dis-franchise except for crime, and then only through the judgments of the courts.

By rejecting the clause limiting the petitioners to a majority of those last voting, we have a law free from constitutional objection and preserving the equality of the citizen, giving to each a voice in the form of municipal government.

Reverse the decree and make the injunction perpetual.

Upon petition to rehear, TURNEY, J., said:

It is conceded by the entire court that the lan-guage of the act, literally taken, means what is claimed for it in the opinion delivered on a former day of the term, but argued that it was not the intention of the Legislature to give it the circumscribed operation its language imports. Let us see whether such is the fact. That part of the act before us is in the eleventh section of the act of 1881, passed April 1, and is as follows : "On the petition of a majority of *the* voters *within the limits* of any such town or city, at *the time of the repeal* or surrender of its char-ter to the county court, said court shall appoint three commissioners for the government of said town or city. To ascertain whether a majority of the voters have petitioned, the number of votes cast at the last municipal election preceding the abrogation of the charter shall be taken as the number of legal voters within the territory."

It is argued the clause last quoted shows it to

have been the purpose of the Legislature to allow any voter who might be within the limits at the time of presenting the petition, to make one of the number constituting a majority of the votes cast at the last election.

To the contrary, I think it clearly means the reverse. We must construe this and the preceding clause together. The term "a majority of *the voters* in the second clause does refer to the "majority of the voters within the limits," in the first clause, etc. Construing them together, they will read: When a majority of the voters, within the limits, etc., at the time of repeal or surrender, etc., shall petition, etc.

The character and qualifications of voters being defined in the first, the language of the second clause must be understood to refer to it, as declaring out of what voters the majority shall be obtained.

This section was amended by the tenth section of the act of 1885, chapter 82, pamphlet acts, page 162, as follows: Providing for "notice of time and place of election to ascertain whether *a majority of the legal voters within the boundaries of such district* desire the organization of the same, at which time and place said commissioners shall open and hold an election," etc.

"Those in favor of the organization of such district, shall have written or printed on their tickets the words 'for the taxing district,' and those opposed to the organization of such district, the words 'no taxing district.' That *the legal voters* of said election *shall be the same that were legal voters at the time of the abolition of the former charter,*" etc.

Thus we have one Legislature saying the petition shall be " of a majority of *the voters within the limits. at the time of the repeal or surrender of the charter,"* and the amendatory act saying, " that *the legal voters* of said election *shall be the same that were legal voters at the time of the abolition."*

We then inquire into the purpose of the amendment and its extent.    It is too plain for argument that the object was to make the question of having a taxing district elective, and at the same time give to the voters who had abolished one form of government the right to establish another by the votes of those who had been entitled to vote under the former charter.    The latter purpose was to do away with the restriction, by the first act, of legal voters to a majority of those who had voted at the last election, and give the right to all who were entitled to vote at the time the charter was surrendered, whether they had or had not voted at the last municipal election, both intending (as suggested in the first opinion) that the abolition of one government and the establishment of another should be as nearly simultaneous as possible.    Both Legislatures are legislating for the same communities, viz.: Voters within defined limits at the times respectively  designated in their acts, the only difference being in their modes of ascertaining who those voters were.    Upon the fact of being voters within prescribed territorial boundaries,  at specified anterior periods of time, there is no difference.    The amendatory act extends the elective franchise to a later day and larger population, but does not inter-

fere with the original act in its local restrictions; on the contrary, expressly retains them in the plainest and most comprehensive words. It is apparent the Legislature of 1885 understood the language of the one of 1881 to be restrictive, both as to places and persons. It allows that as to place not only to stand but repeats it, and enlarges as to persons. Both acted upon the idea that it was proper policy to confine the voters in the effort to establish a taxing district to those who had held but surrendered another form of municipal government.

The original law had been accepted with the understanding of its restriction for four years. Its policy had of course been considered until a second legislative body determined to amend it partially.

The latter act is a construction by the law-making power of the language of the first. By its retention of the restriction now complained of, we see its policy. Whether the policy of a law is wise or unwise, does not concern the courts. If the Legislature had authority to pass it, and did so, it is our duty to enforce it, and not construe it to meet our views of what the law ought to be. If we hold the Legislature did not intend what it said in the first act, we must of course hold it did not mean it in the second, and this, it seems to me, would be rather a bold undertaking against two Legislatures, composed, in part, of some of the ablest lawyers in the State. It would be remarkably strange, indeed, that two Legislatures, speaking four years apart, and acting upon the same idea of popular government,

attempting to legislate upon the same subject, for the same communities, and composed respectively of different representatives of the people, largely interspersed with sound and painstaking lawyers, should so far misunderstand simple and common place expressions as to employ language almost identical in the original and amendatory acts, and still intend a meaning the exact reverse of the words employed. The presumption is certainly in favor of their understanding of the terms used.

To put it beyond doubt that the Legislature of 1885 did understand the language of the Legislature of 1881, in its literal and restrictive sense, a reference to the eighth section of their act is, in my opinion, sufficient. In that, in providing for the abolition of taxing districts, they enact that upon a petition presented to them, signed by two-thirds of the legal voters of the district asking for it, the commissioners shall abolish their taxing district by resigning, etc. There are no restrictive words in this section, so gives the right to every legal voter who may be such at the time of petition, without regard to whether he was so at any time before. Limitation and restriction are purposely avoided in this instance, and purposely placed in the other. A Legislature incapable of construing, is certainly incompetent to amend an act. Legislative constructions are certainly as high authority as many of the law writers we cite daily.

During the four years of the original act, this is the first and only case arising in which it was insisted the law meant other than is expressed in its clear, simple

terms.　The people, the bar and the several Legislatures have thought of the statute in no other light than appears on its face, and after their experience of the four years of its workings, it is simply modified, as already indicated.　It is dangerous to be wise beyond what is written in the statute.

To explain away clear expressions of legislative will, is to make a disturbing and troublesome precedent.　It is to hold, in effect, that no legislative act is a guide for the conduct of the citizen before it has passed through the construction processes of the courts.

If, as conceded by the majority, the language of the act means what I claim it means, but, as they argue does not convey the intention of the Legislature, I ask what language could it have used to convey such intention if it had so desired?　How are we to know the purpose of that co-ordinate department, except by its language?

Our only safe rule is to declare the law as we find it written, unless it violates the constitution. That it may seem to us foolish or impolitic, should give us, as a court, no concern.　That it may seem absurd in its application and administration, is not a matter for our consideration, but for that of the people, through the Legislature.

While I entertain a profound respect for the opinion of the majority, it has failed to create in my mind the slightest doubt of the correctness of my construction, and I adhere to the opinion first delivered, and file it as part of this dissenting opinion.